RECEIVED
CLERK'S OFFICE
IN THE UNITED STATES DISTRICT COURT
2014 JAN 31 PM DISTRICT OF GEORGIA
MACON DIVISION
U S DISTRICT COURT
MIDDLE ... GEORGIA
FA. MACON. GEORGIA

Carletha Stiner, Plaintiff                          )Case No:  5:13-CV-445
                                                     )
              VS                                     )JUDGE:  C. Ashley Royal
                                                     )
Metro Health Medical Center, et al., Defendants     )MOTION FOR AMENDED
                                                     )COMPLAINT


The attached complaint is amended and submitted to the court for consideration.


Respectfully Submitted,

*Carletha Stiner*

CARLETHA STINER, Plaintiff
4041 Bowman Boulevard, Apartment 104
Macon, Georgia  31210
(478)973-1847



Cc:
Philippa V. Ellis                            Michael A. Estes
Owen, Gleaton, Egan, Jones & Sweeney, LLP    Estes, Ingram, Foels & Gibbs, P.A.
1180 Peachtree Street, N.E.                   37 N. Orange Ave.
Suite 3000                                    Suite 300
Atlanta, Georgia  30309-3574                  Orlando, Florida  32802-4974

Suneel C. Gupta
Peters & Monyak, LLP
One Atlanta Plaza, Ste. 2275
950 E. Paces Ferry Rd. NE
Atlanta, Georgia  30326

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF GEORGIA

MACON DIVISION


Carletha Stiner, Plaintiff )Case Number: 5:13-CV-445
4041 Bowman Boulevard, Apartment 104 )
Macon, Georgia 31210 )JUDGE: C. Ashley Royal
(478)973-1847 )
)
         VS )
)
Defendants: )
METRO HEALTH MEDICAL CENTER )COMPLAINT-Medical
Natalie E. Joseph, MD )Malpractice-Maliciously Diagnosed
Stephen W. Tamarkin, MD )With Breast Cancer – Injected With
Paul F. Hergenroeder, MD )Sulfur Colloid Which Has Caused
Michael P. McNamara, MD )Near Fatal Damage
Amer Khiyami, MD )
Leonidas Castro, MD )
Anthony Chang )
2500 Metro Health Drive )
Cleveland, Ohio 44109 )
(216)778-7800; )
PARMA COMMUNITY GENERAL HOSPITAL )
Joseph Cooper, DO )
John Lazo, Jr., MD )
7007 Powers Boulevard )
Parma, Ohio 44129 )
(440)743-3000; )
Vundyala V. Reddy, MD )
308 Coliseum Drive )
Macon, Georgia 31217-3859 )
(478)745-6130; )
CLEVELAND CLINIC )
Holly Dushkin, MD )
9500 Euclid Avenue )
Cleveland, Ohio  44195 )
(800)223-2273 )
Shenin M. Sachedina, DO )
2200 Glenwood Drive, Suite 201 )
Winter Park, Florida 32792 )
(407)740-0827 )

FLORIDA HOSPITAL                                    )
Juan Sauer, MD                                      )
David Molthrop, MD                                  )
Barbara Jaeger, MD                                  )
Haven Murphy, RDMS                                  )
601 East Rollins Street                             )
Orlando, Florida  32803                             )
(407)303-5600                                       )
MEDICAL CENTER OF CENTRAL GEORGIA                    )
Paige Tench, MD                                     )
777 Hemlock Street                                  )
Macon, Georgia 31201                                )
(478)633-7010                                       )

## TABLE OF CONTENT

Affidavit of Merit----------------------------------------------------------------------------

Table of Authorities-------------------------------------------------------------------------Para 1

Complaint-------------------------------------------------------------------------------------Para 2-31

Exhibit A-Physician Service Bill for Biopsy/Lymph Node Removal----------------Para 2, 8, 9

Exhibit B-Dr. Amer Khiyami Diagnosis----------------------------------------------------Para 4, 27

Exhibit C-Dr. Michael McNamara------------------------------------------------------------Para 5, 27

Exhibit D-Sulfur Colloid Injection----------------------------------------------------------Para 6, 25

Exhibit E-Photo of Plaintiff Breast---------------------------------------------------------Para 6, 15

Exhibit F-Surgery for Fluid-------------------------------------------------------------------Para 6, 19

Exhibit G-Dr. Paul Hergenroeder------------------------------------------------------------Para 9

Exhibit H-Dr. Leonidas Castro---------------------------------------------------------------Para 9, 10

Exhibit I-Mastectomy Report-----------------------------------------------------------------Para 12, 24

Exhibit J-Pectoralis Muscle Report----------------------------------------------------------Para 12

Exhibit K-Mammogram Report----------------------------------------------------------------Para 23

Exhibit L-Unknown Psychiatric Doctor------------------------------------------------------Para 13

Exhibit M-Florida Reports---------------------------------------------------------------------Para 14-16, 20

Exhibit N-Dr. David Molthrop----------------------------------------------------------------Para 17

Exhibit O-Florida Hospital CA 27.29 Blood Count----------------------------------------Para 19f

Exhibit P-Plaintiff's Hematology Reports---------------------------------------------------Para 19g

Exhibit Q-Plaintiff's Mental Rating Award Letter-----------------------------------------Para 2,10,13,19

Exhibit R-Prednisolone Information----------------------------------------------------------Para 20

Exhibit S-Metro Health Hematology Results------------------------------------------------Para 3

Exhibit T-Article on FDA Approval of Sulfur Colloid-------------------------------------Para 3

Exhibit U- Prescription Information on Sulfur Colloid------------------------------------Para 3

Exhibit V-Dr. Shenin Sachedina--------------------------------------------------------------Para 18

Exhibit W- Spine Damage---------------------------------------------------------------------Para 7

Exhibit X-Oncotype Result--------------------------------------------------------------------Para 9

Exhibit Y-Parma Hospital Hematology Report---------------------------------------------Para 11

Exhibit Z-Dr. Vundyala Reddy----------------------------------------------------------------Para 23

**Certification of Health Care Provider for
Family Member's Serious Health Condition
(Family and Medical Leave Act)**

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division


U.S. Wage and Hour Division

OMB Control Number: 1215-0181
Expires: 12/31/2011

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave to care for a covered family member with a serious health condition to submit a medical certification issued by the health care provider of the covered family member. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees' family members, created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: *Progressive - Christina Anderson*

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your family member or his/her medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave to care for a covered family member with a serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form to your employer. 29 C.F.R. § 825.305.

Your name: *Danielle*    *Nicole*    *Stiner*
<br>First      Middle      Last

Name of family member for whom you will provide care: *Carletha*    *Stiner*
<br>First      Middle      Last

Relationship of family member to you: *mother*

If family member is your son or daughter, date of birth: _____

Describe care you will provide to your family member and estimate leave needed to provide care:

*transporting to & from treatment · 2-3 wk
in home care cooking meals, bathing, Any needs.*

Employee Signature: *Danielle Stiner*      Date: *7/18/13*

**SECTION III:  For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** The employee listed above has requested leave under the FMLA to care for your patient.  Answer, fully and completely, all applicable parts below.  Several questions seek a response as to the frequency or duration of a condition, treatment, etc.  Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient.  Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the patient needs leave.  Page 3 provides space for additional information, should you need it.  Please be sure to sign the form on the last page.

Provider's name and business address:  Frederick A. Burton   777 Hemlock St Macon GA 31201

Type of practice / Medical specialty:  Family Medicine

Telephone: (478) 471-8593          Fax: (478) 471-8599

**PART A:  MEDICAL FACTS**

1. Approximate date condition commenced:  7/11/13

    Probable duration of condition:  Unknown Indefinite

    Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
    ___ No   _X_ Yes.  If so, dates of admission: _____

    Date(s) you treated the patient for condition:  July 11, 2013 - July 22, 2013

    Was medication, other than over-the-counter medication, prescribed?  ___ No   _X_ Yes.

    Will the patient need to have treatment visits at least twice per year due to the condition?  ___ No   _X_ Yes

    Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
    ____ No   _X_ Yes.  If so, state the nature of such treatments and expected duration of treatment:

    _____

    _____

2. Is the medical condition pregnancy?  _X_ No   ___ Yes.  If so, expected delivery date: _____

3. Describe other relevant medical facts, if any, related to the condition for which the patient needs care (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

    Needs farther tests + Therapy Xrays

    _____

Page 2                          CONTINUED ON NEXT PAGE                     Form WH-380-F  Revised January 2009

**PART B: AMOUNT OF CARE NEEDED:** When answering these questions, keep in mind that your patient's need for care by the employee seeking leave may include assistance with basic medical, hygienic, nutritional, safety or transportation needs, or the provision of physical or psychological care:

4. Will the patient be incapacitated for a single continuous period of time, including any time for treatment and recovery? ___No  √Yes.

   Estimate the beginning and ending dates for the period of incapacity: _7/11/13 → Indefinite_

   During this time, will the patient need care? __ No  ✓Yes.

   Explain the care needed by the patient and why such care is medically necessary:

   _In hospital requiring more tests_
   _+ Tx_

5. Will the patient require follow-up treatments, including any time for recovery? ___No  ✗Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   _Unknown til ō the Hzpital_

   Explain the care needed by the patient, and why such care is medically necessary: _____

6. Will the patient require care on an intermittent or reduced schedule basis, including any time for recovery? __ No  ✗Yes.

   Estimate the hours the patient needs care on an intermittent basis, if any:

   _Several_ hour(s) per day; _____ days per week  from _____ through _____

   Explain the care needed by the patient, and why such care is medically necessary:

   _Food Improvment of medical conditn_

Page 3                        CONTINUED ON NEXT PAGE                   Form WH-380-F Revised January 2009

7. Will the condition cause episodic flare-ups periodically preventing the patient from participating in normal daily activities? ____No __X_Yes.

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: _2_ times per _✓_ week(s) _._ ____ month(s)

Duration: __unknown___ hours or ___ day(s) per episode

Does the patient need care during these flare-ups? ____ No _✓_Yes.

Explain the care needed by the patient, and why such care is medically necessary: _____

_____ For Tx of Medical condition

_____ which can have Flareup

_____

ADDITIONAL INFORMATION; IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

_____

_____

_____

_____

_____

Signature of Health Care Provider _____   Date _7/12/13_

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Form WH-380-F Revised January 2009

1. In accordance with the following statutes, the following Defendants have violated one or more of the codes which have mentally, physically and financially devastated the Plaintiff, Carletha Stiner.

    a. 42 USC§1981, Equal Rights Under The Law

    b. 42 USC§1983, Civil Action For Deprivation of Rights

    c. 42 USC§1985 (3), Conspiracy To Interfere With Civil Rights

    d. 42 USC§1986, Action For Neglect To Prevent

    e. 42 USC§9659(a), (b), (c), Citizens suits

    f. 42 USC§9658, Actions For Damages From Exposure To Hazardous Substances

    g. 42 USC§13981, Violence Against Women

    h. 42 USC§107, Consumer-Patient Radiation Health And Safety

    i. 42 USC§10001(1), (3), Statement Of Findings

    j. 18 USC§831(a), (b), Prohibited Transactions Involving Nuclear Materials

    k. 18 USC§832(a), Participation In Nuclear And Weapons of Mass Destruction

    l. 18 USC§1621, Perjury Generally

    m. 18 USC§1622, Subornation Of Perjury

    n. 18 USC§114, Maiming

    o. 18 USC§241, Conspiracy Against Rights

    p. 18 USC§242, Deprivation Of Rights Under Color Of Law

    q. 18 USC§249(2), Hate Crime

    r. 18 USC§373, Solicitation To Commit A Crime

    s. 18 USC§113(1)(2)(3)(4)(6), Assaults

t. Section 504 of the Rehabilitation Act of 1973

u. Title II of the Americans With Disabilities Act (ADA) of 1990

v. 42 USC 9501, Bill of Rights

w. Georgia codes §9-3-70, §16-4-1, § 16-4-2, §16-4-3, §16-4-6, §16-4-7, §16-4-8, §16-4-8.1, §16-4-10, §16-2-1, §16-2-21, §16-2-22, §16-5-22, §16-5-21, §16-5-20, §16-5-23, §16-5-23.1, §16-5-24, §16-5-25, §16-5-60, §16-13-43, §16-13-44

x. §2305.113, §2315.21, §2323.43, §2903.01, §2903.02, §2923.02, §2923.01, §2923.11(A)(H)(M), §2923.34, §2929.18, §2929.28, §2929.24, §2929.31, §2929.14, §2901.23, §2901.24, §2305.10, §2307.60, §2307.80, §2307.79, §2903.13, §2903.11, §2903.12, §2903.16, §2903.33, §2903.34, §2903.36, of the Ohio code

y. Florida Statute §782.051, §784.011, §784.021, §784.03, §784.045, §766.201, §766.105, §766.106, §627.4148, §627.357, §627.4147, §468.302, §456.50, §459.015, §456.072

2. The following Defendants are accused of medical malpractice and civil rights violations by the Plaintiff, Carletha Stiner who was misdiagnosed with breast cancer by the each Defendant which resulted in breast surgery (Exhibit A) and unnecessary adjuvant therapy. The Plaintiff, Carletha Stiner was unfortunately refused prompt, appropriate, and/or accurate medical treatment after the surgical procedure on January 20, 2010. The Defendants refuse to acknowledge the severe damage caused to the Plaintiff's breast is the result of an injection of sulfur colloid, not breast cancer. The sulfur colloid injection caused damage to the Plaintiff's right breast and chest area, causing retention of fluid, nearly suffocating the Plaintiff. The sulfur colloid is attached to the chest and breast, and the breast is gone according to one medical report. The Plaintiff has been confused by the Defendants actions throughout this medical diagnosis and has come to

realize the non-chalant, comical, and insignificant attitude displayed by the Defendants is because the Plaintiff's white blood cell count, scientifically, does not and did not indicate any sign of disease. The Plaintiff, Carletha Stiner was forced to figure out the medical issue, which has led to astronomical undue stress for the Plaintiff and her family. The belief that the Plaintiff has a mental disorder (Exhibit Q) and simply has breast cancer and is in denial has prevented support from family and legal assistance. The Defendants nearly killed the Plaintiff, Carletha Stiner when they willingly, knowingly, and maliciously diagnosed breast cancer, injected sulfur colloid, neglected to treat the injection, and prescribed nuclear medicine to justify the breast cancer. The Plaintiff was used as a "human guinea pig" by injecting the sulfur colloid into the Plaintiff's right breast and the Defendants waited and observed the outcome. The injection burned the Plaintiff's breast tissues and chest cavity. The Defendants have accumulated hundreds of pages of written medical support for the bogus diagnosis of breast cancer.

3. On December 21, 2009, Metro Health hematology report (Exhibit S), show normal blood counts with the exception of the high MPV count of 11.4, which appears to be typed in. Notice the letters are bolder and the block missing after each typed category. The normal range for MPV according to this blood test result is a low of 7.4 and a high of 9.4. Normal ranges for MPV vary at 7.1 for low to 12.5 for high. The range is manufactured and manipulated by the Defendants to justify and give the impression of breast cancer. The Metro Health hematology report is submitted as verification of the malice intended with the false breast cancer diagnosis and the injection of sulfur colloid into the Plaintiff's right breast. Exhibit U is a report on sulfur colloid injections which was not used in breast cancer care on January 20, 2010. Exhibit T is an article, dated July 22, 2011, announcing FDA approval of sulfur colloid injections for patients who, scientifically, have breast cancer.

4.  On January 8, 2010, Defendant, Amer Khiyami, MD., conspired to cause harm to the Plaintiff, Carletha Stiner when the Defendant diagnosed the Plaintiff with alleged breast cancer, (Exhibit B).  The Plaintiff's white blood cell count, scientifically, did not and does not indicate disease in the Plaintiff's body or breast.  Dr. Amer Khiyami conspired to cover up the false diagnosis and neglected to inform the Plaintiff that the hematology report did not justify the breast cancer diagnosis.

5.  On January 5, 2010, Defendant, Michael P. McNamara, MD., placed clips inside the Plaintiff's right breast during a mammography diagnostic procedure knowing the Plaintiff was diagnosed incorrectly with breast cancer (Exhibit C).  The Plaintiff's white blood cell count, scientifically, did not and does not indicate disease in the Plaintiff, Carletha Stiner's body or breast.  Dr. Michael P McNamara should have informed the Plaintiff that the hematology report on the white blood count did not justify the diagnosis of breast cancer.

6.  On January 20, 2010, Defendants Natalie E. Joseph, MD., Anthony Chang., and Stephen W. Tamarkin, MD., conspired to cause bodily harm to the Plaintiff, Carletha Stiner when the Defendant(s) injected sulfur colloid (Exhibit D) into the Plaintiff's right breast during a surgical procedure and did not provide proper follow-up medical care or instruction. The sulfur colloid caused the Plaintiff's entire right breast to harden within seven (7) days after the January 20, 2010 surgery to remove alleged cancerous lymph nodes.  The Plaintiff assumed the hard breast was a normal result of the surgery.  The sulfur colloid injection has infected the Plaintiff's breast tissue causing inflammation, bleeding, and a foul odor of eggs (Exhibit E).  The sulfur colloid caused the Plaintiff's right breast to shrink several cup sizes.  The sulfur colloid caused damage to the Plaintiff's pleura (Exhibit F), requiring surgical procedures.   The Plaintiff has fluid between the chest and lungs.  A thoracentesis was performed, not pleurodesis.  The Defendants

are claiming a pleurodesis was performed to continue justifying the breast cancer diagnosis. The Plaintiff's white blood cell count, scientifically, did not and does not indicate disease in the Plaintiff's body or breast.

7. The Defendants at Metro Health Medical Center used the diagnosis of breast cancer to justify injecting the Plaintiff with sulfur colloid in an attempt to correct damage done to the Plaintiff's spine in 2001 (Exhibit W). The Defendant, Cleveland Clinic, refused for many years to provide medical care for the damaged spine. The Plaintiff's damaged spine resulted in a slipped disk. Only then did the Defendant, Cleveland Clinic, provide some medical care, which was now too late for back surgery. Coincidentally, sulfur colloid is used for bone marrow issues. The Plaintiff did not receive effective medicine for the spine damage until October 6, 2009, when the Plaintiff visited Metro Health Medical Center for the pain associated with the spine damage. The Plaintiff was asked by Dr. Ram Bandagi to visit the Metro Health Medical Center Women's Clinic for a routine physical, which led the Defendants to a breast cancer diagnosis.

8. The Defendant, Dr. Natalie Joseph also shows an office visit on June 10, 2010 (Exhibit A). The Plaintiff's last visit to Metro Health Medical Center was in March of 2010.

9. On March 18 and 19, 2010, Defendant Paul Hergenroeder, conspired to cover up the mistakes of Defendants Natalie Joseph, Amer Khiyami, and Stephen W. Tamarkin and did not inform the Plaintiff, Carletha Stiner that she was not in need of chemotherapy or radiation due to the fact that the alleged breast cancer diagnosis was erroneous. The Plaintiff received a prescription of tamoxifen from Defendant Paul Hergenroeder on February 26, 2010, with the understanding it would be prescribed for five (5) years. However, this bottle had no refill. Prior to the February 26, 2010 appointment, Defendant Paul Hergenroeder stated he had not consulted with Defendant Natalie Joseph about the Plaintiff's case during an office visit. The Defendant Natalie Joseph

scheduled another visit for the Plaintiff to again see Defendant Paul Hergenroeder who then prescribed tamoxifen tablets without informing the Plaintiff (Exhibit G).   When the Plaintiff contacted Defendant, Dr. Natalie Joseph to get another prescription, on or about March 15, 2010, the Plaintiff was asked, "Where did you get the pills from, you need radiation?"  Only then did the Defendant Natalie Joseph schedule an appointment with Defendant Leonidas Castro, MD., who also did not understand why the Plaintiff was even in his office.  The Plaintiff had to explain to both defendants, Drs. Paul Hergenroeder and Leonidis Castro that Defendant Dr. Natalie Joseph had referred the Plaintiff for radiation and chemotherapy.  Exhibit G are the confusing and inaccurate accounts with the Defendants.  Dr. Hergenroeder claims to have closed the case out on March 23, 2010 because the Plaintiff did not want to take tamoxifen pills (Exhibit H).  However, Plaintiff preferred pills.  Dr. Natalie Joseph stated chemotherapy and radiation was necessary.   Nevertheless, the Defendants prescribed tamoxifen pills without informing the Plaintiff.  On or about July 1, 2010, Plaintiff was contacted by a member of Rite Aid Pharmacy and was told a prescription refill for tamoxifen had been called in via telephone.  The Defendant knew the Plaintiff's white blood cell count, scientifically, did not and does not indicate disease.  On Exhibit A, Dr. Paul Hergenroeder physician's bill inaccurately shows the Plaintiff had an office visit on June 18, 2010.  The Plaintiffs last office visit was on March 23, 2010.  Exhibit X shows the oncotype result was not available on March 15, 2010.  The Plaintiff, Carletha Stiner had received one month supply of tamoxifen on February 26, 2010.

10.  On March 23, 2010, Leonidas Castro, MD., conspired to cause bodily harm to the Plaintiff Carletha Stiner when the Defendant chose to not inform the Plaintiff that chemotherapy was not needed because the diagnosis of breast cancer was not accurate.  The Defendant, Dr. Leonidas Castro chose to state the Plaintiff did not want chemotherapy and implied the Plaintiff, Carletha

Stiner had mental issues which affected the Plaintiff's decision to not have chemotherapy (Exhibit H). Defendant Leonidas Castro said he could not see the Plaintiff, Carletha Stiner because she was late for the appointment and the Plaintiff needed to reschedule. The Plaintiff stopped at the front desk to reschedule but was informed the Plaintiff would receive a call with an appointment if it is necessary. The Plaintiff did not receive a call and did not call again. The Plaintiff's white blood cell count, scientifically, did not and does not indicate disease in the breast.

11.  On May 1, 2012, at approximately 11:17 am, Defendants Joseph Cooper, DO., and John Lazo, MD., conspired to cover up a misdiagnosis of breast cancer by recommending the Plaintiff, Carletha Stiner follow-up at the Cleveland Clinic cancer center for oncology services, knowing the alleged tumor in the Plaintiff's right breast was not diseased based on the Plaintiff's white blood cells count. Drs. Cooper and Lazo should have informed the Plaintiff of the significance of the hematology results (Exhibit Y).

12.  On May 7, 2013, Defendant Holly Dushkin, M.D. conspired to cover up the mistaken diagnosis of breast cancer by confirming the diagnosis and attributing the Plaintiff's shrunken breast to a mastectomy (Exhibit I), which the Plaintiff has no knowledge of. The damage caused by the injection of sulfur colloid was referred to an oncologist to administer unneeded chemotherapy. The sulfur colloid injection has involved the pectoralis muscle (Exhibit J), which is the thick, fan shaped muscle that lies under the breast. What kind of recurring/metastatic breast cancer tumor involves a muscle under the breast? It is not a breast cancer tumor, it is the sulfur colloid injection. The Plaintiff's white blood cells count, scientifically, did not and does not indicate disease. Defendant Dr. Holly Dushkin should have informed the Plaintiff of the significance of sulfur colloid injections.

13.  On July 16, 2013, at approximately 11:40 am., Paige Tench, MD., conspired against the Plaintiff, Carletha Stiner when the Defendant, in a ten minute consultation (Exhibit L), determined the Plaintiff was mentally unstable due to the Plaintiff's disbelief of the diagnosis of breast cancer and prescribed psychotic medicine.

14.  On June 7, 2012, at approximately 11:00 am., Plaintiff, Carletha Stiner was admitted to Florida Hospital with three (3) legions on the outer right breast.  The legions itched only. Exhibit M is the results of the Plaintiff's hematology tests and excerpts of the final report.  The Plaintiff's white blood count, platelet count, mean platelet volume (MPV), and eosinophils levels are all within normal range.  Scientifically, the Plaintiff has no disease within her body on June 7, 2012.  The report states the Plaintiff's hematology is within normal limits.  It also states the right breast shows mild edema, no discharges, no breaks in skin, and mild redness from itching.

15.  On June 8, 2012, at approximately 4:00 pm., Defendants Haven Murphy, RDMS and Barbara Jaeger, MD., from Florida Hospital performed an ultrasound guided vacuum assisted right breast biopsy (Exhibit M).  The Plaintiff was referred for surgical consultation with Dr. Juan Sauer.  The pathology report shows invasive ductal carcinoma, in complete opposition with the scientific hematology report which proves no disease.  The Defendants biopsy was quite painful and caused the Plaintiff a seizure like sensation during the procedure.  Before the biopsy, the Plaintiff had three (3) legions on the exterior right breast.  Within two (2) months, the Plaintiff's breast was consumed with the legions (Exhibit E).  The Defendants caused the Plaintiff's entire right breast to be consumed with legions that now were bleeding, itching, burning, and had a foul odor of rotten eggs.

16.  On June 15, 2012, the Plaintiff was referred to Defendant Juan Sauer, MD., for surgical consultation (Exhibit M).  Defendant Juan Sauer, MD., referred the Plaintiff to the Cancer Center

of Florida for immediate breast cancer treatment. The Plaintiff was informed by a member at Cancer Center of Florida that the Plaintiff's medical records did not indicate a need for the Cancer Center of Florida's services, and referred the Plaintiff, Carletha Stiner back to the referring surgeon, Dr. Juan Sauer, who then refused further contact with the Plaintiff. The Defendant, Juan Sauer, MD., understood the Plaintiff, Carletha Stiner did not have breast cancer. The Defendant was obligated to explain to the Plaintiff the significance of the hematology reports and of the sulfur colloid injection. The Plaintiff's blood count, scientifically, did not and does not indicate disease. The Defendant should have explained to the Plaintiff that the hematology results are inconsistent with the diagnosis of breast cancer.

17. On December 13, 2012, Defendant, David Molthrop, MD, provided Adriamycin and Cytoxan chemotherapy to the Plaintiff, Carletha Stiner, knowing the Plaintiff did not have breast cancer. The Defendant, Dr. David Molthrop also provided two (2) months of tamoxifen tablets in September and October of 21012 for the Plaintiff, knowing breast cancer was not present (Exhibit N).

18. On August 15, 2012, Defendant, Shenin Sachedina, DO., conspired to cover up the misdiagnosis of breast cancer by claiming the Plaintiff's "alleged tumor" was breast cancer rather than sulfur colloid (Exhibit V). The Defendant stated the tumor was inoperable because it has grown beyond the breast area. The Defendant had MRIs completed to verify metastatic breast disease, but when the MRI results came back as negative, the Defendant dismissed the Plaintiff to Defendant, Dr. David Molthrop, an oncologist. The Defendant, Shenin Sachedina knew the Plaintiff's MRI results did not support breast cancer, yet the Defendant refused to inform the Plaintiff. The Plaintiff's hematology reports, scientifically, did not support the Defendants assessment of breast cancer.

19.  On July 11, 2013 at the Medical Center of Central Georgia and September 4, 2012 at the office of Dr. Daniel T. Layish in Florida, Plaintiff Carletha Stiner was admitted and treated for a collapsed lung caused by pleural effusion as a result of the sulfur colloid injection (Exhibit F). The Defendants are claiming the injury to the Plaintiff's chest area was caused by metastatic breast disease due to the cancerous tumor which has grown so extensively that it caused the breast to shrink, the legions to grow on the exterior of the breast, and caused the hole in the chest because the Plaintiff did not have chemotherapy or radiation therapy due to the diagnosed mental issues and cannot understand the severity of breast cancer.  The injury is a result of the sulfur colloid injection.  According to Taber's Cyclopedic Medical Dictionary, sulfur, colloid, alkaloid, leukocyte, and breast cancer are defined as follows:

a.  Sulfur:  A pale yellow, crystalline element; it burns with a blue flame, producing sulfur dioxide.  Sulfur deficiency produces dermatitis and imperfect development of hair and nails.  A deficiency of cystine or cysteine proteins in the diet inhibits growth and may be fatal.  Tissue oxidation of cystine forms inorganic sulfate if the protein intake is sufficient.

b.  Colloid:  A gluelike substance such as a protein or starch whose particles, when dispersed as much as possible in a solvent, remain uniformly distributed and do not form a true solution.

c.  Alkaloid:  One of a group of organic alkaline substances (such as morphine or nicotine) obtained from plants.  Alkaloids react with acids to form salts that are used for medical purposes.

d.  Leukocyte:  A white blood cell or corpuscle which is the primary effector cell against infection and tissue damage.  These cells neutralize or destroy organisms and act as

scavengers, cleaning up damaged cells. When leukocytes are killed along with the pathogenic organisms they have destroyed, the resulting material is called pus, commonly found at the site of localized infections. Pus that collects because of inadequate blood or lymph drainage is called an abscess. Clinically, serum white blood cells counts are important in detecting infection or immune system dysfunction. An elevated leukocyte count (leukocytosis) indicates an acute infection or disease process, whereas a decrease in the number of leukocytes indicates either immunodeficiency or an overwhelming infection that has depleted white blood cell stores.

(1) Neutrophils, fifty-five (55) to seventy (70) percent, are the most numerous white blood cells and are a primary effector cell in inflammation. Identified by staining purple.

(2) Eosinophils, one (1) to three (3) percent of total white blood cells destroy parasites and are involved in allergic reactions. Identified by staining red.

(3) Basophils, less than one (1) percent of all white blood cells are part of the inflammatory response to injury. Identified by staining blue.

(4) Monocytes, three (3) to eight (8) percent of white blood cells become macrophages and phagocytize pathogens and damaged cells, especially in the tissue fluid.

(5) Lymphocytes, twenty (20) to thirty-five (35) percent of white blood cells have several functions: recognizing foreign antigens, producing antibodies, suppressing the immune response to prevent excess tissue damage, and becoming memory cells. Leukocytes in the spleen and lymph nodes may become lymphocytes or monocytes.

e. Breast cancer is a malignant neoplasm of the breast. Positive diagnosis can be made only by obtaining tissue for microscopic examination. The type of treatment, whether surgical,

chemotherapeutic, or both, is determined by the extent of the disease, the patient's age, and her decisions.    The amount of tissue to be removed remains controversial. Lumpectomy removes only the cancerous portion of the breast and axillary nodes; radiation or chemotherapy are adjuvant therapy.

f.  The Defendants, Florida Hospital, used results of the Plaintiff, Carletha Stiner's CA 27.29 (Exhibit O) blood count of 40 on August 17, 2012, which is before any chemical treatment for the Plaintiff's breast has been administered, to justify their diagnosis of breast cancer.  On October 22, 2012 the results rose to 58.8.  On December 3, 2012, the count rose to 73.5.  On December 13, 2012, the count rose to 79.8, which is during two (2) months of taking tamoxifen tablets.   Any number below 40 is considered normal, while a count higher than 40 can be the cause of benign breast disease.  The CA 27.29 is used to determine if the breast cancer has spread to other parts of the body, which is called metastasis.   The Plaintiff's hematology white blood cell count, scientifically, does not indicate disease in the Plaintiff's body or breast.

g.  The Plaintiff, Carletha Stiner had no pain or concerns and had never verbally or in writing complained about her breast to family, friends, or medical personnel prior to or during this alleged breast cancer diagnosis.  The Plaintiff's white and red blood counts have been within normal range prior to and after the January 20, 2010 alleged breast cancer surgery (Exhibit P).  The Plaintiff's white and red blood counts did not fall below the normal blood count range until after chemotherapy treatments began.  The white blood cells are important in detecting disease.  High and low blood counts are an indicator of disease and infection, but further testing is necessary to determine what disease or infection is present.  The Plaintiff's blood count dropped below the normal

level only after receiving abraxane chemotherapy treatments indicating the chemotherapy treatments are more hazardous to the Plaintiff.

20. The Plaintiff, while seeking medical assistance for the breast issue at the Florida Hospital, also sought treatment at the Veteran's Administration Medical Center and received prednisone (steroid) dose pack, for an eye infection, which actually affected the Plaintiff's right breast. The Plaintiff had not received any chemotherapy treatment at that time. After taking the prednisone tablets for only two (2) days, the Plaintiff's legions on the exterior of the breast no longer bled and shrank considerably, and the odor dissipated (Exhibit R). After the Plaintiff completed the prednisone dose pack, the color of the Plaintiff's breast had nearly returned to its natural color. The Plaintiff's breast was black and leaked pus and some blood before taking the prednisone tablets. The inflammation in the Plaintiff's breast flared up soon after the Plaintiff stopped the prednisone dose pack.

21. The Plaintiff was again prescribed prednisone for an eye infection while receiving chemotherapy at the Northside Hospital Cancer Institute. The prednisone again affected the Plaintiff's right breast. The Plaintiff was receiving home care assistance and had received six (6) abraxane chemotherapy treatments which were slowly clearing up the infection. The prednisone cleared up the Plaintiff's legions within seven (7) days. The Plaintiff did not have an abraxane chemotherapy treatment the week the prednisone medicine was taken. The Plaintiff's breast had cleared of infection when the Plaintiff returned for more chemotherapy treatment. The Plaintiff's home care assistance stopped after taking the prednisone.

22. The Plaintiff, Carletha Stiner after asking various doctors, "Where is my right breast, what happened to it, why is it smaller and hard with legions on the outside", was told by Dr. David Molthrop, "The abscesses on the Plaintiff's exterior breast were the cancer tumors which

"pushed through" or "popped out" the breast." Dr. Shenin Sachedina said, "The tumor had grown beyond my breast area and was inoperable." An unknown doctor said, "They were cancer tumors spreading and growing on the outside of the Plaintiff's right breast." Dr. Holly Dushkin stated, "The breast was small due to a mastectomy." Dr. Conti stated, "The breast cancer tumor was so big that it absorbed the Plaintiff's breast". Naturally, a tumor growth that large within the breast would make the breast larger, not smaller. The sulfur colloid injection hardened and the acid burned the breast tissue which shrunk the Plaintiff's right breast and caused the physical and mental damage. Had the Defendants at any time, after the diagnosis of breast cancer, come forward with the scientific knowledge of the hematology results, the Plaintiff would not have been subjected to more undue stress. The Defendants abused the Plaintiff's medical diagnosis of delusional disorder and used that as the basis for not receiving adequate medical treatment. The Defendants confused the medical issues because the Plaintiff did not have breast cancer, and all the Defendants clearly were aware of that fact.

23. On or about July 11, 2013, the Plaintiff Carletha Stiner was informed by Defendant Dr. Vundyala V. Reddy that the Plaintiff would be dead within a year without chemotherapy to shrink the alleged stage IV cancerous tumor. On July 24, 2013, Defendant Dr. Vundyala Reddy, conspired against the Plaintiff by continuing to cover up the wrong diagnosis of breast cancer when the Defendant administered to the Plaintiff seven (7) abraxane chemotherapy treatments Exhibit Z). The Plaintiff requested validation or proof that the abraxane chemotherapy treatments were in fact shrinking the alleged tumor and was informed on or about October 24, 2013 that the alleged tumor was "scattering" within the right and left breast (Exhibit K). Exhibit K is accompanied by the Plaintiff's August 1, 2006 mammogram report which also states moderate fibroglandular tissue, but with no masses and calcifications or radiographic evidence.

Tumors should shrink, not scatter.  The conspiracy to cover up a botched medical diagnosis by insisting chemotherapy was necessary to avoid the damage has been confirmed by the mammogram results (Exhibit K) which does not state the alleged tumor is shrinking, as it should. The Plaintiff's blood count, scientifically, does not and did not indicate disease in the Plaintiff's body.

24.  An examination result states the Plaintiff had a mastectomy on January 20, 2010 (Exhibit I).

25.  Exhibit D states sulfur colloid was injected into the Plaintiff's breast.

26.  Exhibit K states lime salt is present.

27.  Exhibit B states lymph node removal and lumpectomy on January 20, 2010.

28.  The Plaintiff is seeking court order to surgically remove the sulfur colloid tumor and scattered tumor from the breast without the use of unnecessary and/or excessive chemical weapons like chemotherapy and radiation.  The Plaintiff, Carletha Stiner's white blood count, scientifically, does not, and did not indicate   disease in the Plaintiff's breast.  The use of steroids actually treated the "alleged malignant tumor", easier and quicker than the nuclear medicine the Plaintiff has been prescribed.   There are two (2) witnesses to verify the effects of the chemotherapy and radiation versus the steroid treatment on the Plaintiff's breast.

29.  The high neutrophils count is a result of the acute inflammation, burn injuries, stress, and infection in the breast tissues from the sulfur colloid injection.   A high mean platelet volume (MPV) is thrombocytosis, not pleurodesis.

30.  Based on the controversial evidence the Plaintiff has received from the onset of this diagnosis, Carletha Stiner is compelled to seek assistance and restitution from the courts.  The Plaintiff is seeking answers in regard to the medical professions normal range level for blood count.  Is the normal range for blood count manipulated to justify false positive diagnostics?  Is

the medical profession obligated to inform a patient of discrepancies in a diagnostic result if the opinion of the doctor contradicts scientific evidence, i.e., the blood result? The Plaintiff, Carletha Stiner, and her family have been and continue to be traumatized by the careless medical diagnosis and treatment.  The Plaintiff still requires medical treatment and the Plaintiff's white blood count did not indicate disease.

31.  The Plaintiff is seeking compensatory and punitive damages from the Defendants for pain and suffering, and for the lack of companionship from family and friends caused by the Defendants confusing, conflicting, and malicious diagnosis and medical treatment of breast cancer and alleged schizophrenia.


Respectfully Submitted,

*Carletha Stiner*

CARLETHA STINER, Plaintiff